PETER S. CHRISTIANSEN, ESQ.
Nevada Bar No. 5254
pete@christiansenlaw.com
KENDELEE L. WORKS, ESQ.
Nevada Bar No. 9611
kworks@christiansenlaw.com
KEELY A. PERDUE, ESQ.
Nevada Bar No. 13931
keely@christiansenlaw.com
CHRISTIANSEN LAW OFFICES
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
Tel: (702) 240-7979
Fax: (866) 412-6992
*Attorneys for Defendant Leslie Kalyn*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>LESLIE KALYN, aka<br>Leslie Feth,<br><br>　　　　　　Defendant. | Case No. 2:18-cr-00169-JCM-NJK-3<br><br>**DEFENDANT LESLIE KALYN'S MEMORANDUM IN AID OF SENTENCING** |

Defendant LESLIE KALYN, by and through her attorneys, PETER S. CHRISTIANSEN, KENDELEE L. WORKS and KEELY A. PERDUE of CHRISTIANSEN LAW OFFICES, hereby files her Memorandum in Aid of Sentencing.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

CHRISTIANSEN LAW OFFICES
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
702-240-7979 • Fax 866-412-6992

CHRISTIANSEN LAW OFFICES
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
702-240-7979 • Fax 866-412-6992

# I.

## STATEMENT OF FACTS

**A.    Relevant Portions of the Guilty Plea**

On July 2, 2020, pursuant to a plea agreement, Ms. Kalyn plead guilty to one count of Illegal Remunerations for Health Care Referrals, a violation of 42 U.S.C. §§ 1320a-7b(b)(1)(A). The parties expressly agreed that the applicable sentencing guidelines would be as follows:

| | |
|---|---|
| Base Offense Level [USSG §2B1.1 (a)(2)] | 6 |
| Use of special skill [USSG § 3B1.3 | +2 |
| Mitigating Role: [USSG § 3B1.2(a)] | -4 |

The Parties did not stipulate to a particular loss amount or range and instead, reserved the right to argue over any applicable adjustments based on such calculations pursuant to USSG §2B1.1 and any enhancements under USSG §2B1.1(7)(B)(i).  The Parties further agreed that unless Ms. Kalyn failed to meet certain obligations (all of which she has fulfilled), the United States Attorney's Office ("USAO") would seek a downward adjustment of at least two levels for acceptance of responsibility and an additional one level reduction in the event the total offense level prior to such reduction is 16 or higher.  Finally, the USAO agreed to recommend a sentence at the low end of the advisory guideline range, while Ms. Kalyn reserved the right to seek a downward variance based upon the applicable guidelines and 18 U.S.C. § 3553(a).  ECF No. 139 at 8-9.

It is of particular significance that the Parties did not agree to a specific binding loss amount within the plea agreement.  Ms. Kalyn is a Canadian citizen and permanent resident of the U.S.  She recognizes her decision to plead guilty could have significant immigration consequences and the total loss amount could be material to her ability to remain in the U.S., where both of her children are natural born citizens.  Although the Defense asserts the instant conviction is not one involving a crime of "moral turpitude," a crime of "fraud or deceit" may be considered an aggravated felony and thus, the basis for deportation where the loss amount exceeds $10,000.  *See* 8 U.S.C. § 1101(a)(43)(M).

**B.     Who is Leslie Kalyn?**

Ms. Kalyn is thirty-seven years old and a mother to two children: a daughter, London, age 6, and a son, Pierce, age 8.   Ms. Kalyn holds a doctorate in nursing practice and is an advance practice registered nurse.  She has no prior criminal convictions, and at the time of the instant offense was on the heels of a tumultuous divorce.  Vulnerable and financially unstable, Ms. Kalyn became romantically involved with Co-Defendant Alejandro Incera, which was the conduit for her becoming a party to the conduct that gave rise to the instant prosecution.   Ms. Kalyn's relationship with Incera was frought with manipulation and verbal abuse.  *See* select text messages between Kalyn & Incera, attached hereto as **Exhibit "A."**  Ms. Kalyn has long since cut all ties with Incera.

Subsequent to the indictment, Ms. Kalyn started her own practice and continued to treat patients while raising and supporting her two young children.  Two of Ms. Kalyn's patients have provided this Court with letters of support documenting her exemplary bedside manor and the quality care she has provided.  *See* Letters of Support attached hereto as **Exhibit "B."**  Ms. Kalyn recognizes however, there is risk she may lose certain medical privileges as a result of the instant conviction, so she began to diversify her business to provide business development and consulting services to doctors and other medical practitioners.   Unfortunately, due to the COVID pandemic, the demand for those services has substantially diminished.  Ms. Kalyn is optimistic that with economic recovery she will be able to continue to grow her business.  In the meantime, she is making continued efforts to develop a website and market her services while continuing to volunteer her time with charitable causes.

Ms. Kalyn regrets her actions and takes full responsibility for her violations of the law, which are an exception in an otherwise law-abiding life. *See* **Exhibit "B"**  (Letters of Support). Time and again, Ms. Kalyn's supporters reiterate that the instant conduct is a significant departure from her character and life history.  *Id.* Perhaps more importantly, each of them also note that Ms. Kalyn is focused on working to change the patterns and relationships that lead her to such a place so that these behaviors are never again repeated.  *Id.*

CHRISTIANSEN LAW OFFICES
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
702-240-7979 • Fax 866-412-6992

CHRISTIANSEN LAW OFFICES
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
702-240-7979 • Fax 866-412-6992

1    Ms. Kalyn's friends and family agree she has learned a great many lessons from her

2    misconduct in this case and she has and will continue to take responsibility for her poor choices.

3    The Defense nevertheless urges this Court to consider the degree to which Mr. Incera exerted

4    significant influence over Ms. Kalyn.  It is clear based on the prosecution of this case and the

5    subject plea agreement that even the Government agrees Ms. Kalyn's role was minor in

6    comparison with Incera and the other related defendants.

7    Ms. Kalyn recognizes she must take responsibility for her actions but she respectfully

8    requests that this Court consider allowing her to continue the positive path she has descended

9    upon and repay her debt while on supervised release with the ability to continue raising her

10   children.  If granted the opportunity, Ms. Kalyn will continue to use her education and skill set to

11   provide a stable life for her children, pay restitution and make a positive impact on our community

12   in order to right her wrongs.

13   **C.      The Pre-Sentencing Investigation Report Recommends Probation**

14   The Presentence Investigation Report (PSR) prepared by the United States Probation

15   Office ("USPO") contains a total offense level calculation of 22, with an additional three-point

16   reduction for acceptance of responsibility, making 19 the total recommended level to be applied

17   at the time of sentencing.  In arriving at that total, the USPO used a loss amount of $1,163,965.75,

18   to applied an additional 16 points to the base level of 6.  At an offense level of 19, based upon

19   Ms. Kalyn's lack of any criminal history whatsoever, she is a Category 1, meaning the guideline

20   range falls at 30 to 37 months incarceration.  The USPO however, recommends a downward

21   variance and the imposition of a non-guideline sentence of probation.

22   The USPO bases its recommendation for a downward departure on Ms. Kalyn's lack of

23   criminal history, exemplary compliance for more than two years on supervised release, her

24   background, education and ability to maintain gainful employment while raising her two children;

25   and her minimal role in the subject offense(s).  PSR at ¶¶154-161.  The USPO also took into

26   account that Ms. Kalyn will now be a felon, is likely to lose certain medical privileges and has

27   sustained damage to her professional reputation, all of which are significant punishment, even

28   absent incarceration.  *Id*.

4

CHRISTIANSEN LAW OFFICES
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
702-240-7979 • Fax 866-412-6992

1    Ms. Kalyn appreciates the USPO's consideration of each of these factors and well-

2    reasoned justification for a significant downward departure and non-custodial sentence.  The

3    Defense must however, object to use of the total loss amount as a basis for a 16- point increase in

4    the applicable offense level, particularly in light of the lack of any stipulated loss amount and the

5    vast disparity between the alleged total loss and the total kickback payments attributable to Ms.

6    Kalyn.

7    **D.    Ms. Kalyn Played a Lesser Role in the Charged Conduct**

8    The underlying conduct alleged in this case involves a conspiracy to commit health care

9    fraud.  Ms. Kalyn was named in 7 of the 29 counts alleged in the indictment.  She ultimately plead

10   guilty to just one charge: Illegal Remuneration for Health Care Referrals.  The USAO agrees that

11   Ms. Kalyn's role was minimal compared to that of Incera and the defendants in related case nos.

12   2:18CR00197-001 (Horace Paul Guerra) and 2:19CR00161-001 (Nelson M. Mukuna).

13   In particular, Ms. Kalyn is accused of accepting kickbacks in exchange for referring

14   patient prescriptions to Atlas Pharmacy, which Dr. Mukuna owned and operated.   Although the

15   PSR specifies a total loss amount of $1,163,965.75, the USPO asserts Ms. Kalyn received a mere

16   $24,100.  *See* PSR at p. 4 and 23.  When interviewed on the date of her arrest, Ms. Kalyn estimated

17   she received $4000-$5000 in cash payments.  *See* Corrected Transcript of Kalyn Interview, at p.

18   40, relevant portions of which are attached hereto as **Exhibit "C."** The guilty plea agreement is

19   silent as to the amount Ms. Kalyn is alleged to have pocketed.  ECF No. 139 on file herein.

20   Likewise, nowhere in Ms. Kalyn's guilty plea agreement is a total amount of loss, even

21   referenced, much less calculated or agreed upon.  *Id.*

22   Moreover, in the USAO's sentencing memorandum regarding Mukuna, there was no

23   allegation that Ms. Kalyn received more than $24,000, but merely that she is believed to have

24   received "approximately more than $10,000" in kickback payments, while the total kickbacks

25   exceeded $175,000.  *See* Government's Memorandum in Aid of Sentencing in Case 2:18-cr-

26   00161-RFB-PAL, ECF No. 14 at pp. 3-4, a copy of which is attached hereto as **Exhibit "D."** This

27   Court should also note that the time of his sentencing in December 2018, Mukuna had already

28   paid more than $1,750,000 and has presumably repaid even more in the ensuing years.  *Id.* at 4:18

CHRISTIANSEN LAW OFFICES
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
702-240-7979 • Fax 866-412-6992

Thus, Mukuna has already paid substantially more than the approximately $1.1 million amount the USPO calculates as the total loss amount in this case.

## II.

## LEGAL ARGUMENT

**A.    The Sentencing Reform Act**

In the Sentencing Reform Act of 1984 ("SRA"), Congress set forth numerous factors to be considered by Courts when determining the appropriate sentence. One of these factors, of course, is the sentence prescribed by the Guidelines. 18 U.S.C. § 3553(a)(4). However, the guidelines are one consideration among many this Court must weigh with respect to Ms. Kalyn's sentence. Also to be considered and particularly relevant here, are the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence to protect the public from further crimes of the defendant; and the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a)(1)(2)(7). Moreover, as this Court is well aware, the Guidelines are not mandatory but rather, advisory and this Court has sole discretion to determine the appropriate sentence for Ms. Kalyn's crimes. *See generally U.S. v. Booker*, 543 U.S. 220, 246, 125 S.Ct. 738, 757 (2005).

**B.    The Loss Amount Calculation has a Disproportionate Impact on the Applicable Sentencing Range.**

The government bears the burden of proving the total loss amount to be used to calculate the applicable offense level. *See U.S. v. Hymas*, 780 F.3d 1285, 1289 (9th Cir. 2015). While the USPO recommends that Ms. Kalyn be held to answer for a loss amount that increases her base level offense by 16 points, the USPO bases those numbers on broad allegations regarding the total claims on which Atlas Pharmacy was paid – those loss amounts have never been litigated and nowhere in Ms. Kalyn's Guilty Plea Agreement is there any reference to, much less a stipulation regarding the total amount of claims paid to Atlas, or the total remuneration Ms. Kalyn received. Rather, the parties opted to resolve this matter without agreeing to a specific loss amount – thereby affording this Court substantial leeway in making that determination.

CHRISTIANSEN LAW OFFICES
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
702-240-7979 • Fax 866-412-6992

Ms. Kalyn played a lesser role in the instant offense and even by the USPO's calculation, received just $24,100 - far less than the total alleged loss amount.  Indeed, the USAO, in its sentencing memo regarding Mukuna, did not estimate that Ms. Kalyn received more than $24,000.  Instead, the government asserted only that it believed she received an amount in excess of $10,000.  The government's variance in the estimated amount Ms. Kalyn actually received, coupled with the Parties' decision to resolve this case without ever agreeing to the total loss amount, is indicative of the lack of reliable evidence on which to calculate these two figures.  Accordingly, this Court may appropriately conclude the government has not met its burden in proving the applicable loss amount.  Thus, it would be unjust to apply any enhancement under USSG 2B1.1.

The severe immigration consequences that could attach based upon a loss amount that has been neither agreed to nor litigated, further weigh in favor of this Court determining that no such enhancement should be applied.  To minimize the risk of adverse immigration consequences and possible deportation, Defendant requests that the Judgment of Conviction in this case reflect that the Court could not find a loss amount in excess of $10,000.  The agreed upon offense level is 4 prior to any enhancement for loss amount, so with a 3-point reduction for acceptance of responsibility, the Court would use an offense level of 1.  Equally as significant, regardless of the loss amount, the USPO nevertheless arrives at recommending a downward departure and the imposition of a non-custodial sentence.  So even absent any enhancement for loss amount, this Court may reasonably impose the same non-custodial sentence the USPO asserts will meet the ends of justice.

## C.    Request for Downward Departure and a Non-Custodial Sentence

This Court has wide discretion in crafting a sentence that is minimally sufficient to meet the ends of justice.  Even if this Court was to accept the USPO's offense level of 19, strict adherence to the United States Sentencing Guidelines would result in a sentence that exceeds the retributive needs of a criminal sentence.  To that end, in recommending probation for Ms. Kalyn, the USPO uniquely recognizes that a significant downward departure is warranted and that a

**CHRISTIANSEN LAW OFFICES**
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
702-240-7979 • Fax 866-412-6992

1  custodial sentence would go beyond that which is necessary to meet the ends of justice.  PSR at

2  ¶¶154-161.

3       Ms. Kalyn has zero criminal history.  By all accounts, the instant conduct represents a

4  dramatic departure from Ms. Kalyn's character and life history.  Her missteps cannot be justified

5  by the tumultuous and dark life experiences she was enduring at the time.  However, to better

6  understand how Ms. Kalyn arrived at such a stark deviation from her character, the Defense urges

7  this Court to consider the emotional and financial toll of divorce along with a subsequent abusive

8  relationship and Incera's exertion of influence over her.  Ms. Kalyn has moved past her divorce,

9  has shared legal custody of her two young childen and has severed all ties with Incera.  By all

10  accounts, Ms. Kalyn has always remained a loving and committed mother.  Ms. Kalyn's friends

11  and family attest to her commitment to never return to the behavior patterns and relationship

12  choices that helped lead her astray.

13       In sum, Ms. Kalyn certainly regrets her misconduct and recognizes the overall harm that

14  has resulted from her actions.  The fact is that Ms. Kalyn did engage in criminal activity - a clear

15  breach of any citizen's responsibility, and in this case, one she understands negatively impacts

16  the medical profession and society as a whole.   However, there is no evidence that a period of

17  incarceration is necessary to deter Ms. Kalyn from further criminal conduct.  As a result of her

18  choices, Ms. Kalyn has already been branded a felon, suffered significant damage to her

19  professional reputation and is faced with the risk of immigration consequences.   These

20  consequences in and of themselves are sufficient to deter any future criminal conduct.

21  Accordingly, Ms. Kalyn respectfully requests that this Court impose a non-custodial sentence

22  such that she may be able to repay her debts while on supervised release with the ability to work

23  to pay restitution and care for her children.  Additionally, Ms. Kalyn requests that this Court

24  impose restitution joint and severally, and at most, in the amount of the $24,100 the USPO asserts

25  she received, or alternatively at the approximate $10,000 amount the USAO estimated she

26  received at the time of Mukuna's sentencing.

27  / / /

28

CHRISTIANSEN LAW OFFICES
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
702-240-7979 • Fax 866-412-6992

1

**V.**

2

**CONCLUSION**

3    As is all too common the temptation in this case is to look at the events that lead to the

4  Defendant's prosecution in a vacuum—crediting each decision and action to some nefarious

5  immoral character flaw. To do as described would be to turn one's back on the application of

6  justice and, in direct opposition to the guidance provided by *18 U.S.C. §3553(a)*.  Instead, the

7  Defense asks that this Court consider Ms. Kalyn's lack of a criminal history, character and life

8  experiences. It is for these reasons that Ms. Kalyn respectfully requests that the Court order a

9  non-custodial sentence in this case.   Ms. Kalyn also requests that this Court confirm within the

10  Judgment of Conviction that the documented loss amount does not exceed $10,000.

11    Respectfully submitted this 25th day of September, 2020.

12

CHRISTIANSEN LAW OFFICES

13

14  By_____

15    PETER S. CHRISTIANSEN, ESQ.
      KENDELEE LEASCHER WORKS, ESQ.

16    KEELY A. PERDUE, ESQ.
      *Attorneys for Defendant*

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit "A"

# Exhibit "A"

 

**Verizon** 12:36 PM 87%

 **Alex Incera**
last seen Jun 5, 2018



go out to get fuc **Fri, Jan 19**
california dude

8:52 PM

remember that you filthy whore, did
you bounce on his cock like you do
to me, did you tell him lies like you
did to me, im gonna fixate on your
ass you whore, that body of yours
you say you like to keep in shape,
lol, lets see how you gonna do that
with what is about to hit you you
vain cunt, you use people

8:55 PM

come on cunt, lets end this the
right way, bitch you wanna hate me

8:55 PM

**Alex Incera**
last seen Jun 5, 2018

more than I can explain   8:12 AM

Sun, Jan 21

You used fear to keep me for so long.   8:12 AM

i feel dirty   8:12 AM

I stayed because I wanted you.   8:12 AM

Oops   8:12 AM

Not wanted you   8:12 AM

Feared you.   8:12 AM

That was part of it.   8:12 AM

Does that feel good?   8:12 AM

I stayed longer then I should because I feared you would hurt me.   8:13 AM

i did hurt you   8:13 AM

i always hurt you   8:13 AM

It until I became fearless of you

 Verizon 🛜          12:35 PM          ⏰ ❋ 87% ▰

< 1   **Alex Incera**
      last seen Jun 5, 2018          ◻️ 

Fri, Jan 19          8:44 PM

because now there is this fucking disgust with you in my stomach and its brewing into such unmatched hate
8:45 PM

YESSS FUCK YESSS   8:45 PM

lets do this bitch   8:46 PM

lets really do this   8:46 PM

you are so fucked   8:46 PM

its just gonna roll on you out of nowhere
8:46 PM

and guess who is going to help
8:46 PM

guess who is gonna finally put an end to your abuse and playing the victim role
8:47 PM

im not gonna say shit on here, but oh boy, lets do this, come on!!!
8:48 PM



come on bitch!! you fucking whore, its all you ever wanted to be, get

\+           

.ıll Verizon 🛜          12:36 PM          ⏰ ❋ 87% 🔋

 1   **Alex Incera**
          last seen Jun 5, 2018           

go out to get fuc Fri, Jan 19
california dude
                                    8:52 PM

remember that you filthy whore, did
you bounce on his cock like you do
to me, did you tell him lies like you
did to me, im gonna fixate on your
ass you whore, that body of yours
you say you like to keep in shape,
lol, lets see how you gonna do that
with what is about to hit you you
vain cunt, you use people          8:55 PM

come on cunt, lets end this the
right way, bitch you wanna hate me
                                    8:55 PM

YOU WANNA HATE MEEE!!!
                    8:55 PM

im gonna give you all you need to
do that
                            8:56 PM

come on you coward answer and
lets do this          8:56 PM

god is your whole family a bunch of
sexually fucked up people and

＋                              📷  🎤

‧‧ Verizon 🛜          12:36 PM          ⏰ ⁂ 87% 🔋

‹ 1   **Alex Incera**          📹   📞
last seen Jun 5, 2018

cowards?          Fri, Jan 19          8:57 PM

what a waste of flesh          8:57 PM

im gonna take everything from you, your kids, your school, your dreams, so you wont ever hurt another man again          8:58 PM

you are a fucking killing machine
          8:58 PM

someone needs to stop you
          8:58 PM

maybe thats why god put me in your path          8:59 PM

to stop you          8:59 PM

🎥 Missed video call at 8:56 PM

do you not see what an awful person you are you sick fuck
          8:59 PM

you have a fucked up sex craving, you gonna end up a whore for sure
          9:00 PM

➕          📷   🎤

.ıl Verizon 🛜                     12:38 PM                    ⏰ ❊ 86% ▭

‹ 1      **Alex Incera**                              ◻️        📞
         last seen Jun 5, 2018

It's all you ever do                          9:08 PM ✓✓
                      Fri, Jan 19
                   Keep going                  9:08 PM ✓✓

oh darling, i have not started yet
                                    9:08 PM

                            I know.   9:08 PM ✓✓

                   You are that evil.   9:09 PM ✓✓

after you land, i ghost, but just wait
to what follows                  9:09 PM

let me tell you how this will go
                            9:09 PM

first, kiss school good bye, i mean
like seriously              9:09 PM

since this is what you covet most, i
will take from you        9:10 PM

second part is the damsel in
distress                  9:10 PM

guess who will ride in to safe the       ⌄
day                  9:10 PM

DARIN      9:10 PM

+                               📷        🎤

‹ 1   **Alex Incera**
last seen Jun 5, 2018

one way or another, here it is
Fri, Jan 19
9:02 PM

surprise bitch   9:02 PM

thought i could forgive that
9:03 PM

you better answer coward, or its gonna get bad for you, im gonna get it all out now because you are in another country and not here so the laws dont apply   9:04 PM

once you land, im not gonna text or call you ever, since i know how cunts like you do men   9:05 PM

There it is.   9:05 PM

im gonna drive you back into the arms of darin   9:05 PM

the men you left   9:05 PM

you wont use the laws here against me   9:06 PM

Just because I hate you doesn't

.ıll Verizon 🛜          12:39 PM          ⏰ ✳ 85% ▰

‹ 1     **Alex Incera**                    ▢◁      📞
        last seen Jun 5, 2018

9:20 PM

Fri, Jan 19

ive taken steps to rectify everything
you know and nullify it
                              9:21 PM

so its just empty threats from you
                              9:21 PM

but me, oh boy, me    9:21 PM

well you know, i cant get into any
details
                              9:21 PM

so how you liking your future so far
                              9:22 PM

because with me it was a lot worse
right
                              9:22 PM

i was that bad right    9:22 PM

i molested you right    9:22 PM

who molested you Leslie    9:22 PM

who    9:22 PM

tell me bitch    9:22 PM

let it oug    9:22 PM

out    9:22 PM

＋                          📷      🎤

 Verizon    12:39 PM      85%

**Alex Incera**
last seen Jun 5, 2018

say your peace          **Fri, Jan 19**
                          9:23 PM

who fucked your head, and pussy
                                    9:23 PM

who did it    9:23 PM

talk bitch    9:23 PM

you want to hate, let me teach you
how, i had great teachers    9:24 PM

i swear on my daughter Leslie,
come monday, your life will never
be the same    9:24 PM

you deserve it so bad, so go out
and whore it for the last time, thats
why you dont answer the fone
                          9:25 PM

cause youvare out being a whore,
like i knew you would    9:25 PM

                          Lovely!    9:26 PM 

you think i dont know how your
crooked mind works    9:26 PM

                     

 **Alex Incera**
last seen Jun 5, 2018                     

you had enough of my ABUSE,
what, it dont see **Fri, Jan 19** had
enough of their cocks, how come
you dont hate them?                    9:53 PM

i will not allow ever, a woman to
play me like that again or try to hurt
me                    9:59 PM

i warned you                    9:59 PM

you gonna try and use the law here
against me, but you are in another
country, cant do shit, the moment
you land, i ghost for ever, well, only
when you see me in..... never mind,
you will know                    10:00 PM

you are so out and partying, you
whore                    10:01 PM

i hope you get gang rape, wait no, i
forgot you like that shit, i hope
someone just dumps a load on you
and leaves, that way you can feel
special                    10:02 PM



the party whore does it again, what
a nice role model

                     

 Verizon 📶        12:42 PM        ⏰ ✳ 83% 🔋  

**< 1   Alex Incera**
last seen Jun 5, 2018        🎥   📞

for your two kids  **Fri, Jan 19**
10:03 PM

good work there whore mother of
the year
10:03 PM

call me when you get back in so i
can feel you in on your future, im
bored now and you are a coward
chicken shit, just remember, once
you land i ghost, and you will only
see me when its your turn to pay,
and i will be there, front and center,
making sure you see who did it
10:06 PM

im out till you decide how you want
this to go, you want it to go good,
or bad, its really up to you, but you
gonna have to talk to me one way
or another b4 you get back if you
want me to take it easy on you.
10:07 PM

so its really up to you, call me and
talk to me, get it over with
10:08 PM



ill wait <u>till midnight</u>, is that enough
time to get your whoring out of

+                            📷   🎤

iil Verizon 📶                    12:42 PM                  ⏰ ✳ 83% ▬▬

‹ 1   **Alex Incera**
       last seen Jun 5, 2018                              📹   📞

Fri, Jan 19    10:24 PM

please help me not burry you
10:25 PM

do something   10:25 PM

help me   10:25 PM

stop partying and help me
10:26 PM

that brother of yours will ruin your life
10:26 PM

answer me god dammit   10:26 PM

answer me   10:26 PM

please help me be the man i am and not change to what i hate, please
10:27 PM

you fucking liar!!! i hate you
10:27 PM

i hate you   10:27 PM

i hate you   10:27 PM

liar   10:28 PM

＋                                    📷   🎤

▪▪▪ Verizon 📶                 12:42 PM                ⏰ ✳ 82% 🔋

 1  **Alex Incera**
                        last seen Jun 5, 2018          🎥    📞

liar    10:28 PM          Fri, Jan 19

liar    10:28 PM

liar    10:28 PM

two face liar    10:28 PM

i hate you    10:28 PM

you lied to me    10:28 PM

you fucking lied    10:28 PM

and you do it with such a straight
face                            10:29 PM

liar    10:29 PM

its all you are    10:29 PM

and playing the victim    10:29 PM

i want you to know who did this to
you, i want you to look at me and
wonder how it all happened, how it
all went south, because you were a
fucking liar, and then played the
victim, you have wounded me like
no other, just as i knew you would,



+                              📷    🎤

 **Alex Incera**
last seen Jun 5, 2018    

victim, you have  Fri, Jan 19  ne like no other, just as i knew you would, but i guess i needed to find out if i can come out of this, lets see if i can, i will make it so, i will pull out of this, from your grasp, but you will not hurt another man again you evil liar, user, abuser, i will make certain of this, just hurry up and get here so i can start my fucking crusade against cunts like you, who use their pussy as a,weapon and kill poor bastards along the way, that stops on monday, i promise you that, it stops monday.  10:36 PM

im gonna be up all night again, but my torture will be short lived, you are partying and will read all this when you get back in all drunk and whored out by your brother and act like you didnt go any where, fucking chicken shit, answer, who cares at this point if you went out or not, im still gonna make sure you never hurt another man again



 

# Exhibit "B"

# Exhibit "B"

Brian A. Sagert, MBA
7245 W. Rosada Way
Las Vegas, NV 89149

September 23, 2020

Honorable Judge James Mahan
333 S. Las Vegas Blvd.
Las Vegas, NV 89101

Your Honor,

My name is Brian A. Sagert, former U.S. Department of Housing & Urban Development Southern Nevada Field Office Director, and current Member of the State of Nevada Board of Finance.  I write this character reference letter on the behalf of Leslie Kalyn for whom I've come to know and respect, both professionally and personally over the past year.

I first met Ms. Kalyn in a professional setting when I was seeking holistic remedies to address personal medical conditions, and I found her guidance and treatments to be very effective.  Ms. Kalyn not only created solutions for my physical needs, but she also inspired me to learn more about my mental and emotional self, through a process called Human Design.  This model of self-analysis and awareness has enlightened me to better understand myself, and I've become a better person for myself and others. I owe that progress to Leslie's recommendation, and her care for me as a patient and friend.

Our relationship has grown into a trusting friendship. We both have similar interests in helping other individuals in the community that are less fortunate to better their lives. Being in the community development / social service industry, I'm intrigued with the vision Leslie has to create programs to inspire and empower those seeking to better their physical, mental, and emotional well-being .  In fact, I intend to include Leslie, and her programs to address the mental and emotional needs of individuals as part of a mobile affordable housing initiative I am currently working on developing.

Leslie's passion to help the community is clearly evident in how she now lives her life.  I witnessed her leave a professional hockey game before it ended, where her favorite team was playing, to attend an event which benefitted the Shade Tree here in Las Vegas.  In my capacity as a Community Development lender with a national Community Development Financial Institution (CDFI), Leslie and I have held discussions on creating a charter school which incorporates new innovative learning methods including a Human Design component to adapt to, and better engage, today's students. Ms. Kalyn also actively participated with me on discussions with the City of Las Vegas and the plans to redevelop the Old West Side which includes the development of four new Wellness Centers. Leslie's expertise and recommendations provided were highly welcomed by the City Director.

I have felt Leslie's tears on my shoulder, and I have seen the pain in her eyes this matter has caused in her life and sincerely know she has remorse for past actions.  I also see how she has grown and reconciled her path by the joy in her smile, the light in her eyes, and the passion in her heart, when she discusses her plans for the future.  Leslie inspires others, and she has inspired me as well, to better our lives.  Many people have come and gone in my life, and I can sincerely state that I hope Leslie stays in my life forever as she is a compassionate and caring person and a true friend.

Sincerely,

Brian A. Sagert, MBA

Honorable James C. Mahan,


This letter is in reference to Leslie Kalyn and her upcoming hearing.  I have known Leslie Kalyn for 3 years and have always found her to be honest, positive and willing to help others.  I know her as a successful Health Practitioner, a supportive friend and most of all, a loving and supportive Mother of 2.


When I asked her about this case and how she was involved, she always owned what she did and took full responsibility.  We need more people like Leslie Kalyn to take responsibility for their actions and not blame everyone around them.  This case has, at times, paralyzed Leslie to the point of wanting to give up.  To me, she has shown regret and remorse and needs to put this in her past.  She has much to offer and will be some one that makes a difference in the world.


I am hoping the courts will agree and enable her to move on.


God Bless.

Jonathan L. Ellis

Gina Mondragon
Valentino Lane
Las Vegas, NV 89138

September 22, 2020

Dear: Honorable Judge James Mahan

My name is Gina Mondragon and I am both a patient and friend of Leslie's. I have known Leslie for a couple of years now both professionally and personally. I first came to know Leslie professionally. She did amazing work on my friends and I aesthetically. I have been to many other clinicians and firstly her bed side manner is top notch. She made me feel heard and cared for like I had not been before. Second, she performed amazing work. She corrected aspects of my appearance that I had been trying to correct but no one else was able to. Third, she did highly skilled work with such gentleness which lessened my anxiety and discomfort substantially.  I am so grateful for her understanding and dedication to my needs.

From Leslie's care, sense of humor, kindness, and innovative mind I was drawn to develop a friendship with her. From our friendship, I have witnessed how she conducts herself as a person and as a mother. Leslie is a very loving mother who takes on any load of responsibility she needs to ensure her children are cared and provided for. For example, Leslie raised her children last year alone without her children's father physical or financial support, and without family support (as they lived in Canada). She was also not able to find employment as a clinician because of her pending case. Despite not knowing much about owning a business, and the struggles there were in doing so, she chose to take this on over any alternate. It is commendable she demonstrated her dedication to legitimately providing for herself and her children while not burdening the system or others.

I also have heard and seen how impactful her case, her past decisions, and the struggles she endured over the last two years have been on her. She has accepted responsibility for the decisions she made that led her to appearing before you and she does not blame others for the decisions she made nor the struggles that resulted from that. She has expressed her regret and I have seen how she has transform herself because of this. I have also seen the changes she made with how she conducts herself regarding the opposite gender. Leslie demonstrates assertion, healthy communication, and boundary setting that demonstrates she has learned how to function in a healthy domestic partnership.

Leslie really has a beautiful and well-meaning heart, and has so much to offer as a friend, mother, professional, and citizen. She has accepted responsibility for her mistakes, has suffered greatly from them already, and has certainly demonstrated the changes she made within herself so she will not make the same mistakes again. I believe Leslie is on the right path and is taking steps to create a bright future for herself and her children. Thank you for considering my perspective in your decision!

Sincerely,
Gina Mondgragon

John and Deb Kalyn
Box 6235, Peace River, AB, Canada  T8S 1S2

September 22, 2020

Honorable James C. Mahan
333 S Las Vegas Blvd.
Las Vegas, NV
89101

Attention:     Honorable James C. Mahan
RE:            Dr. Leslie E. Kalyn

We are the parents of Leslie Kalyn and are writing this letter of reference for our daughter. We are saddened by the circumstances that have led to Leslie having to appear before you. Our daughter is a loving mother of two children.  She is an intelligent, disciplined woman, who was able to complete her doctorate degree while balancing work and caring for her children.

Unfortunately, after a difficult divorce, Leslie found herself in an extremely vulnerable place. She struggled both financially and emotionally.   When she met one of the medical professionals at her place of employment she allowed herself to be naïve about activities in which she would never otherwise have become involved.

It is completely out of Leslie's character to become involved in this type of activity. She was brought up in a home that valued hard work, honesty and trustworthiness and throughout her life, we have observed her exhibit those virtues.  Never before or since, has Leslie willingly or knowingly done anything illegal.  It is not in her nature.

John and Deb Kalyn

Box 6235, Peace River, AB, Canada  T8S 1S2

The last 2 years have been extremely challenging for Leslie.  Having a felony charge hanging over her head has made it difficult at times for Leslie to be gainfully employed. However, she has taken the time to truly reflect on what has brought her to this point.  She is aware of the mistakes she made.  She has owned up to those mistakes and has identified how she came to make the decisions she made.   She is diligently working on her shortcomings and improving her self-esteem and self-confidence.    Her future plans include developing humanitarian projects and continuing to work hard to find ways to leave the world a better place.

In closing, we would like to say that our daughter is a good person.  She is the youngest of our three children and has achieved the highest education of them all.  She has blessed us with two beautiful grandchildren and is the hardest working person we know.  We wish the circumstances were different and that this letter of reference to you would not be necessary.  Our daughter, Leslie, is still young and has a bright future.  We would ask that you take into consideration the virtuous qualities of our daughter when determining her sentence.

If you require further information, we may be reached by email at: dkalyn@nykalenterprises.com or by phone at:  780.901.6483.

Sincerely,

John Kalyn                                    Deb Kalyn

# Exhibit "C"

Exhibit "C"

INTERVIEW v.

**LESLIE KALYN**
June 1, 2018

Page 1

8         INTERVIEW OF LESLIE KALYN

10         JUNE 01,2018

16 **PRESENT:**
17 FBI AGENT – Carey Zachary Scott
18 INVESTIGATOR – Jared Reed
19 INTERVIEW - Leslie Kalyn

25 **TRANSCRIBED BY:** HUMBERTO RODRIGUEZ

Page 2

1     **ZACH:** You're going to sit on that side
2 over there.
3     **LESLIE:** Oh, right makes sense.
4     **ZACH:** Okay you probably have like a
5 million questions.
6     **LESLIE:** I have no idea (INAUDIBLE)of
7 anything. (INAUDIBLE) with my kids.
8     **ZACH:** Your kids are --- We can answer
9 that. They are with their dad.
10     **LESLIE:** Yeah, yeah, he came and got them.
11     **ZACH:** Okay, good, good. You already have
12 a water. If you need another one let me know.
13     **LESLIE:** Okay, thanks.
14     **ZACH:** Do you have a pen handy by chance?
15     **JARED:** Yup.
16     **ZACH:** Okay. So, yeah, you have a
17 thousand questions. I've got lots of answers and I
18 can say even before we get done that there are a lot
19 of other people the both of us are a lot more
20 interested in when it comes to the case that we are
21 working.
22     **LESLIE:** Okay. I would imagine so cause I -
23 --
24     **ZACH:** Yeah, rest a sure.
25     **LESLIE:** I have no idea what (INAUDIBLE).

Page 3

1     **ZACH:** But something we have to start
2 with before we can answer any questions and chat. We
3 have
4 some paperwork we gotta do.
5     **LESLIE:** Sure, sure, okay.
6     **ZACH:** So, this is Las Vegas. This is
7 paper rights form. Just like, kind of like on TV.
8     **LESLIE:** I don't watch TV. I have apple and
9 it's kid shows on Netflix.
10     **ZACH:** I don't have cable. Yeah, the kids
11 on Netflix. Yeah, we've watched them all like fifty
12 times in the last (INAUDIBLE.
13     **JARED:** The good (INAUDIBLE) don't knock
14 it.
15     **LESLIE:** It is a good one.
16     **ZACH:** So, I'll read this out loud to
17 you. Before you ask any questions, you have to
18 understand your rights. The right to remain silent,
19 anything you say can be used you in court and you
20 have the right to talk to a lawyer for advice before
21 we ask any questions. You have the right to have a
22 lawyer with you during the questioning. If you can
23 not afford a lawyer one will be appointed for you
24 before any questioning if you wish and then big line
25 here if you decide to answer questions now without a

Page 4

1 lawyer present, you have the right to stop at any
2 time.
3     **LESLIE:** Right, okay.
4     **ZACH:** So, that's the important one. If
5 you get uncomfortable and you don't want to, we can
6 stop.
7     **LESLIE:** Okay.
8     **ZACH:** So, that sort of how that works.
9     **LESLIE:** If I choose to wait for my
10 attorney or whatever what --- how does that work in
11 terms of the next step?
12     **ZACH:** Um-hum.
13     **LESLIE:** So, do I delay things or ---
14     **ZACH:** You can, it's not something that I
15 can tell you one way or the other. If we wanna--- if
16 you want to get some questions answered today, then
17 you can talk.
18     **LESLIE:** Yeah, I mean would like to at
19 least get ---
20     **ZACH:** Basics?
21     **LESLIE:** Yeah, yeah.
22     **ZACH:** So, yeah if you would like to do
23 that then sign there and we will witness.
24     **LESLIE:** Answer questions without
25 (INAUDIBLE) okay.

Page 37

1   **LESLIE:** Well in their charts, but like I
2   said I
3   had separate primary care charts for patients. So, I
4   mean I don't know. Not all of them I mean like that
5   was one of things like they were saying that needs
6   documents like with everybody and so I didn't for the
7   first month or so just because this is the problem
8   that Dr. Karam was saying --- which is part of the
9   reason I wanted --- I ended up leaving --- I wanted
10  to leave was because he brought me in to do primary
11  care and psych to create a psych home, we call a
12  psych home or medical home but for psych patients. He
13  said, "Okay you can do these services, primary care
14  services, but we are working on a contract with HPN
15  so we can't bill them as primary care. So, you just
16  have to be careful with how you, how you document or
17  how you chart so that when we do the audit it doesn't
18  look like it's a primary care. So, I would chicken
19  scratch on the site notes so at least there is
20  documentation. This was at the beginning so at least
21  there is documentation but without it being like a
22  full primary noted that he would still be able to
23  reimburse. So, I was caught trying to finagle, okay
24  well I'm trying to do good and trying to provide a
25  service that we said were going to do, but then he is

Page 38

1   saying that the insurance company won't reimburse for
2   that. So, I'm going, "Okay" So, that's what I did
3   maybe it was even more than a month in that I went to
4   Dr. V or went to Dr. Villareal come in? He came in—I
5   don't remember when he was hired, but so I started
6   talking to him about this and what I was doing and I
7   was bringing on these different things and the bigger
8   things I wanted to do like the urine toxicology
9   because we weren't even doing urine toxicology on
10  patient on benzodiazepines which for me that's a big
11  liability. You're giving people stuff and they could
12  be on all sorts of other you know street drugs. So,
13  anyway I digress. What was your question?
14   **JARED:** So, you talked about that you
15  maintained primary care files.
16   **LESLIE:** Yeah, I had primary care files in
17  just like sheets of paper. Cause the file--- cause
18  sometimes it's just sheets of paper cause I had you
19  know my little stack and I had folders and then the
20  M.A. would take them and, so.
21   **JARED:** Were you ever written up or was
22  there ever any internal memos issued to the
23  prescribers regarding ---
24   **LESLIE:** No.
25   **JARED:** That HBI was not supposed to ---

Page 39

1   **LESLIE:** Never.
2   **JARED:** Do primary care?
3   **LESLIE:** Never.
4   **JARED:** I've seen, I've seen those
5   documents and so I want to make sure again that as I
6   was just talking that we are all on the same, we're
7   being honest.
8   **LESLIE:** No, I was --- I was terminated.  I
9   was terminated after I gave my resignation. He never
10  told me, ever --- I was never written up.
11   **JARED:** Okay.
12   **LESLIE:** I was never written up. That's why
13  I was upset. I'm like --- That's why I went to the
14  E.E.O.C. I mean this is retaliation. This is BS that
15  he's doing this. He went to the board, he made
16  complaints. I've just been, you know money on
17  fighting stupid erroneous complaints. Gene site
18  testing? He accused me of genetic testing that there
19  was no, like no --- they can't even bill Medicaid for
20  it. There was no reimbursement they --- I mean like –
21  there is---no, there --- no, I was never, ever, ever,
22  ever written up.
23   **JARED:** Okay.
24   **LESLIE:** If he did that was all forged up.
25   **JARED:** Okay.

Page 40

1   **LESLIE:** I did not sign anything except the
2   day that I was terminated, and I said, "Okay,
3   whatever"
4   and I signed off that they terminated me.
5   **JARED:** So, we move past that then. So,
6   again what we talked about is that you felt the
7   lidocaine was a good alternative?
8   **LESLIE:** Yeah and it actually really was.
9   People were doing really well with it from what I
10  understood the patients that come back.
11   **JARED:** And then at some point you started
12  giving these envelopes. So, how much, like how much
13  money would you say you actually received from
14  Nelson?
15   **LESLIE:** Over the two and half or three
16  months or whatever?
17   **JARED:** Yeah.
18   **LESLIE:** Maybe let's see. I have to think,
19  I think the first one is going to be five hundred and
20  then it was --- I think the most that I got was
21  fifteen --- I don't know maybe four thousand, five
22  thousand maybe.
23   **JARED:** At one time?
24   **LESLIE:** No, just total.
25   **ZACH:** Total.

Exhibit "D"

Exhibit "D"

DAYLE ELIESON
United States Attorney
KILBY MACFADDEN
Assistant United States Attorney
501 Las Vegas Blvd. South, Ste. 1100
Las Vegas, Nevada 89101
Phone: (702) 388-5069 / Fax: (702) 388-5087
Kilby.Macfadden@usdoj.gov

*Representing the United States of America*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA
### -oOo-

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No.: 2:18 -cr-00161-RFB-PAL** |
| **Plaintiff,** | |
| **vs.** | **GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING** |
| **NELSON MUKUNA, D.Pharm.,** | |
| **Defendant.** | |

Certification: This response is timely.

### I.  Introduction

In this case, the defendant Nelson Mukuna ("Mukuna") and his co-conspirators, Alejandro Incera[1] ("Incera"), Robert D. Harvey ("Harvey"), and Leslie Kalyn ("Kalyn"), were the knowing participants of a lucrative cash kickback referral scheme for expensive compound prescriptions. This scheme was orchestrated and operated through the Mukuna owned Atlas Specialty Pharmacy ("Atlas"). In order to increase his prescription referrals, Mukuna paid medical professionals cash kickbacks to have their patient's prescriptions processed through Atlas. Mukuna knew this was practice was illegal and was able to make significant profits due

---

[1] These are the three defendants in the related matter of the *United States v. Harvey Et Al*, 2:18-cr-169-JCM-NJK.

1

to this lucrative scheme.

## II.  Statement of Facts and Procedural History

### A. Factual Background

In 2014, Mukuna opened Atlas as the primary owner and operator.  Mukuna opened Atlas after he realized that there was a need for specialized care in the Las Vegas Valley.  Atlas concentrated in specialty pharmaceuticals, which focused on high-dollar drugs and injectables. Atlas contracted with Medicare for both managed care and fee for service. Atlas also contracted with Medicaid and Health Plan of Nevada ("HPN").

Atlas specialized in expensive drugs like Lidocaine, Diclofenac Sodium, and Modafanil, instead of Schedule II Controlled Substances like opioids, because Mukuna wanted to avoid intense regulatory oversight.

Billing was handled electronically by Mukuna at first, and then by his pharmacists and technicians, at his direction. As part of the fraud, Atlas sometimes would process and even deliver of the prescriptions to the patient's home, even when patients were not aware they were ever prescribed the expensive drugs.

In 2015, HPN began handling prescriptions in-house, which resulted in a major loss in business for Atlas. After the loss in business, Mukuna began to look for ways to supplement Atlas' income.

While Mukuna worked at Horizon Hospital he became friends with Harvey. Harvey worked as a surgical technician at Horizon. In approximately June 2016, Harvey introduced Mukuna to Incera, an Advanced Practice Registered Nurse ("APRN"), who was one of the top prescribers of Modafinil in the District of Nevada. Mukuna, Harvey, and Incera were friends and socialized.

At the medical spa, where Incera worked, Incera and Mukuna developed a verbal arrangement in which Mukuna provided Incera Xeomin (a form of Botox injection) without charge to Incera in exchange for Incera's referral of patients to Atlas for their prescriptions. As their relationship developed, Incera referred increasingly more patients to Mukuna and Atlas.

In January 2017, Incera demanded cash payments instead of Xeomin. As such, Mukuna paid Incera $100 cash for each patient referral.

Due to the success with his relationship with Incera, Mukuna used the kickback arrangement with other providers. Mukuna approached providers whom Mukuna had worked with throughout his previous positions, to see if they were willing to refer patients to Atlas in exchange for cash payments. Once Mukuna offered cash for patient referrals, business significantly improved.

In order to pay the kickbacks, Mukuna knowingly withdrew the cash payments from his business account with Nevada State Bank. With all of the kickbacks that Mukuna paid, he would make withdrawals several times a week. The kickbacks totaled more than $175,000 between approximately November 2016 and December 2017. Mukuna knowingly structured cash withdrawals to avoid a Currency Transaction Reports ("CTRs") from being generated on his banking activities associated with the kickback payments.

In November 2016, Incera introduced Mukuna to Kalyn. Incera and Kalyn worked together at Human Behavior Institute ("HBI"). Kalyn started engaging in the kickback referrals with Mukuna as well. While at HBI, Incera and Kalyn were the two highest paid participants in Mukuna's illegal kickback scheme. Incera and Kalyn would call or text the names of the patients they referred to Mukuna. Then Mukuna would transfer the information and fill in the prescription.

In January 2017, Harvey and Incera came to Mukuna and demanded an increase to

3

$200 per patient referral. Mukuna agreed to $200 payments. Kalyn received approximately more than $10,000 in kickback payments from Mukuna for her patient referrals.

Mukuna knew that Incera and Harvey worked with Dr. Guerra. Harvey had prescriptions that were pre-signed, and had Guerra's name added to them in order to circumvent Incera's exclusion from Medicaid billing in September 2017. In October 2017, Incera asked Mukuna to switch all of Incera's patients to Guerra. Mukuna refused because he knew these patients were never actually seeing Guerra. As such, Mukuna was aware of Harvey and Guerra's suspect behavior but never reported them or their actions to the DEA or any law enforcement. Mukuna terminated all kickbacks on or about early 2018 only when he suspected he was under federal investigation.

## B. Procedural Background

On June 1, 2018, in this case, 2:18-cr-00161-RFB-PAL, Mukuna pleaded guilty to a two count Criminal Information charging him with Conspiracy to Commit Health Care Fraud in violation of 18 U.S.C. § 1349; and Structuring Transactions to Evade Reporting Requirements, in violation of 31 U.S.C. § 5324(a)(3). Pursuant to the plea agreement, the Government agreed to recommend an offense level of 21, and that it would argue for a sentence within the guideline range as determined by the court. Mukuna is permitted to argue the 3553(a) factors and request a variance to a sentence below the guideline range. Mukuna agreed to pay the $3,749,121.29 in restitution. To date, Mukuna has paid more than $1,750,000 in restitution.

Mukuna is currently due to be sentenced before this Court on December 3, 2018. The Presentence Investigation Report ("PSR") prepared by the U.S. Probation Department, calculates Mukuna's sentencing guideline range as 37-46 months. Probation recommends a low-end 37 month sentence per count, to be served concurrently. The Government's sentencing memorandum follows.

# I. Sentencing Argument

## A. Legal Standard for Determination of an Appropriate Sentence

The framework for determining an appropriate sentence is set forth in 18 U.S.C.§ 3553(a), which requires that the Court ensure the sentence imposed properly considers, among other factors: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need to reflect the seriousness of the offense and promote respect for the law; (4) the need to afford adequate deterrence; and (5) the need to avoid unwarranted sentencing disparities.

## B. Under USSG §5K1.1, the Government Moves for a 4 Level Reduction in Mukuna's Total Offense Level Based on His Substantial Assistance to Law Enforcement

Mukuna's principal benefit to the Government was his willful, thorough cooperation in the prosecution of his co-conspirators Incera, Harvey, Kalyn and Guerra. The undersigned AUSA certifies that Mukuna's cooperation was instrumental and essential in successfully prosecuting those defendants under cases 2:18-cr-169-JCM-NJK and 2:18-cr-197-JCM-NJK, respectively. Due in part to Mukuna's timely assistance, defendants Incera and Harvey have both entered guilty pleas and will be sentenced before the Honorable Judge Mahan on January 10, 2019. Dr. Guerra was sentenced on October 26, 2018, by the Honorable Judge Mahan to twelve months and one day in custody.

Mukuna has provided substantial assistance to the Government and it therefore requests that the Court make a significant departure under USSG §5K1.1 by reducing Mukuna's total offense level by four levels, leaving him with a total offense level of 17, and a resulting guideline range of 24-30 months in custody.

### C. Mukuna Should be Sentenced to Serve a Prison Sentence at the Low-End of the Guideline Range – As Recommended in the PSR to Vindicate the Important Principles of General Deterrence, Address the Seriousness of the Offense, and Promote Respect for Health Care Fraud and Structuring Laws

*Nature and Circumstances of the Offense; Need to Reflect the Seriousness of the Offense and Promote Respect for the Law*

Mukuna is a person who possesses a high intelligence and incredible work ethic. He received an extensive education and attained his pinnacle of his profession as a Doctorate of Pharmacy. Unfortunately, he applied that intellect and work ethic to promote a fraudulent scheme that seriously depleted valuable Medicaid funds, which were meant for the most vulnerable members of the public, not a rich pharmacist owner and his co-conspirators. Mukuna's marketing genius and energy, when combined with his co-conspirators Incera, Harvey and Kalyn's desire for lucrative for cash kickbacks, promoted this large scale compound pharmacy schemes through Atlas. The scheme also imposed an expense on public resources to investigate and legally untangle the high priced compounding pharmacy and combat the scheme's impact. A person with Mukuna's high intellect knew the eventual impact of the scheme would have on Medicaid funds and the resources of law enforcement.

Concern that "white-collar offenders" received special treatment and "frequently do not receive sentences that reflect the seriousness of their offenses" was among the motivations for the Sentencing Reform Act that gave rise to the Sentencing Guidelines. S. REP. NO. 98-225 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3260. Among its principal architects was Justice Stephen Breyer, an original member of the Sentencing Commission. He explained that the Guidelines addressed the issue by requiring a "short but definite period of confinement" for all but "the least serious cases of these white-collar offenses (level '6' or less)[.]" Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 HOFSTRA L. REV. 1, 22 (1988). Not only did this reflect the severity of the offenses, it resolved

"significant disparities" observed in data gathered by the Commission on how white-collar crimes were treated at sentencing relative to equally serious non-white-collar offenses in the pre-Guideline era. *Id.* at 20.

The cumulative Medicaid and patient harm is exponential when considering the overall scheme that Mukuna orchestrated and the loss for the medically unnecessary prescriptions issued by Mukuna and processed through Atlas totaling a loss of almost $4 million. Therefore, the seriousness of this crime mandates a low-end guidelines sentence.

### History and Characteristics of the Defendant

Mukuna has not had any pretrial issues and paid substantial restitution while pending sentencing. While paying significant restitution presentence is commendable, and he promises to pay more, sentencing with a singular goal of facilitating restitution is improper. *United States v. Crisp*, 454 F.3d at 1287, 1290 (11th Cir. 2006). If Mukuna is sentenced to prison, he will be able to pay any remaining restitution before reporting for his custodial sentence, or while supervised release after serving his term of imprisonment.

In making a low-end recommendation, the Government is accounting for the fact that Mukuna, has provided substantial cooperation, has been compliant with Pretrial Services pending sentencing, and paid significant restitution. Without these factors, the Government would be recommending a more significant custodial sentence.

### Avoidance of Unwarranted Sentencing Disparities

Of note, the first of Mukuna's related co-conspirators to be sentenced was Dr. Guerra. The Government argued for a 13 month custodial sentence. He received a 12 month and one day prison sentence from Judge Mahan on October 26, 2018 in case number 2:18-cr-197 JCM-NJK. Guerra and Mukuna were both related to the larger scheme, with Guerra's role being significantly less involved and without anywhere near the same financial gain or culpability as

Mukuna. The two men operated different operations that made this entire fraud a lucrative criminal enterprise. Both men were essential to their own financial success, or the potential of financial success. The disparity factor at 3553(a)(6) does not, however, address disparities among codefendants, but addresses nationwide disparities. *United States v. Damato*, 672 F.3d 832, 848 (10th Cir. 2012) (stating that Section 3553(a)(6) refers to disparities nationwide among defendants with similar records and guideline calculations rather than a comparison of sentences among codefendants).

Mukuna's scheme was significant due to the amount of loss to Medicaid and the amount of the expensive compounded prescriptions he allowed to be fraudulently processed and paid out. In addition, with each structured deposit of his ill-gotten gains, he was avoiding proper payments and evading lawful regulations. Statistical analyses of sentencing outcomes have limited value. *See, e.g.*, *United States v. Shteyman*, 610 F. App'x 60, 63 (2d Cir. 2015) ("the proffered statistics "provide no details underlying the sentences" and are thus 'unreliable to determine unwarranted disparity.'" (quoting *United States v. Irving*, 554 F.3d 64, 76 (2d Cir. 2009)); *United States v. Pape*, 601 F.3d 743, 750 (7th Cir. 2010) (describing an argument based on statistics regarding sentencing by offense category as "lacking substance" because no analysis explained the disparities); *United States v. Willingham*, 497 F.3d 541, 544 (5th Cir. 2007) (holding that "[a]verages of sentences that provide no details underlying the sentences are unreliable to determine unwarranted disparity because they do not reflect the enhancements or adjustments for the aggravating or mitigating factors that distinguish individual cases.").

That all said, nationally in 2017, probation only sentences in fraud cases occurred only 15% of the time.[2] In Nevada, that number drops to 11.8% for the same period. *Id.* at 8.

---

[2] *See* United States Sentencing Commission, *Statistical Information Packet, Fiscal Year 2017, District of*

Conversely, prison only sentences accounted nationally for 73.5% of sentences, *id.* at 7, and for 55.9% of cases in Nevada.

Again, acknowledging the limited value of statistics, it appears that a disparity would be created by sentencing Mukuna to probation, or a below guidelines range, rather than prison.

### *Need for Adequate Deterrence*

General deterrence is one of the prescribed goals of every sentencing, see 18 U.S.C. § 3553(a)(2)(B) and *United States v. Dyer*, 216 F.3d 568, 570 (7th Cir. 2000) (noting one principal objective of criminal punishment is deterrence), but it occupies an especially important role in sentencing for

As to specific deterrence, a prison sentence at the low-end of the guideline range would illustrate to Mukuna, that, even though these types of criminal schemes will bring him assets with which he might later pay restitution, and knowledge about other criminal actors about whom he can assist the Government, he will still go to prison, and thus should never reoffend. To impose a probationary or below guidelines sentence would send the message that the consequences of a criminal scheme might be dramatically softened as long as there is the prospect of restitution and cooperation if later caught. Mukuna has already received credit for his cooperation and assistance, but there is still a specific deterrent message that he will only internalize through a prison sentence.

//

//

//

---

*Nevada*, p.7 *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2017/nv17.pdf (accessed November 21, 2018).

## IV.  Conclusion

Based on the above, this Court should sentence the defendant Nelson Mukuna to a 24 month custodial sentence followed by three years of supervised release.

Respectfully submitted this 26th day of November, 2018.

DAYLE ELIESON
United States Attorney

*s/ Kilby Macfadden*
Assistant United States Attorney

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## <u>Certificate of Service</u>

I hereby certify that on November 26, 2018, I electronically filed the foregoing Government's Memorandum in Aid of Sentencing with the Clerk of the Court for the United States District Court for the District of Nevada using the CM/ECF system.

*s/ Kilby Macfadden*
KILBY MACFADDEN
Assistant United States Attorney
United States Attorney's Office
